# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ONE WORLD TECHNOLOGIES, LTD.,
and RYOBI TECHNOLOGIES, INC.,

    Plaintiffs,

v.

REXON INDUSTRIAL CORPORATION,
LTD., and POWER TOOL SPECIALISTS,
INC.,

    Defendants.

No. 04 C 0833
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Plaintiffs One World Technologies, Ltd. and Ryobi Technologies, Inc. (collectively, "One World") allege infringement of United States Patent No. 6,658,976 (the "'976 Patent" or "the Patent") by Defendants Rexon Industrial Corporation, Ltd. and Power Tool Specialists, Inc. (collectively, "Rexon"). The invention claimed in the '976 Patent improves upon traditional miter saws by offering an ergonomic handle. The Patent is also directed to the design of a miter saw in which the handle adjusts relative to the rotation of the miter saw blade, allowing the operator to maintain a comfortable grip on the handle when the blade is tilted on an angle. The parties dispute the meaning of a number of terms found in the claims.

Claim construction is a matter of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). In order "[t]o ascertain the meaning of claims, [the court] consider[s] three sources: The claims, the specification, and the prosecution history." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996). These three sources are the intrinsic evidence, public records available for all to consult

when determining the meaning and scope of a patent claim. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). When the intrinsic evidence unambiguously describes the scope of a patented invention, reliance on extrinsic evidence, such as expert testimony and treatises, is inappropriate. *Id.* at 1583.

Claim interpretation begins with the actual words of the claims. *Bell Communications Research v. Vitalink Communications Corp.*, 55 F.3d 615, 619-20 (Fed. Cir. 1995); *see also Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). Generally, the words, phrases and terms in patent claims should receive their ordinary and accustomed meaning. *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). The strong presumption in favor of the ordinary meaning may be overcome only when the patentee "clearly set[s] forth a definition for a claim term in the specification." *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306 (Fed. Cir. 2003) (*citing Johnson Worldwide Assocs.*, 175 F.3d at 989-90); *see also Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001) ("a technical term used in a patent claim is interpreted as having the meaning a person of ordinary skill in the field of the invention would understand it to mean") (citation omitted). A patentee "may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics Corp.*, 90 F.3d at 1582 (citation omitted).

Additionally, "[c]laims must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979 (citations omitted). The specification may reveal "whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics Corp.*, 90 F.3d at 1582. "The specification is always highly relevant to the claim construction

analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."
*Id*. The specification also serves as an aid in determining "the meaning of the claim term as it is used . . . in the context of the entirety of [the] invention." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001) (quoting *Comark Communs., Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998)).

The claims, however, are not limited to the embodiment shown in the specifications. *See Anchor Wall Sys.*, 340 F.3d at 1307; *Transmatic, Inc. v. Gulton Indus.*, 53 F.3d 1270, 1277 (Fed. Cir. 1995). Limitations appearing only in the specifications cannot be read into a claim because "the claim, not the specification, measures the invention." *Howes v. Zircon Corp.*, 992 F. Supp. 957, 961 (N.D. Ill. 1998) (citing *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107 (Fed. Cir. 1985)). However, when the specification is "clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed Cir. 2001).

Each patent has a corresponding publicly-available record called the prosecution history, which details the proceedings before the Patent and Trademark Office ("PTO"). The prosecution history may limit the interpretation of claim terms by revealing express representations made by the applicant regarding the scope of the claims or by excluding interpretations that were disclaimed during prosecution. *Vitronics*, 90 F.3d at 1582-83 (citations omitted). However, "unless altering claim language to escape an examiner rejection, a patent applicant only limits claims during prosecution by clearly disavowing claim coverage." *Kopykake Enters. v. Lucks*

3

*Co.*, 264 F.3d 1377, 1382 (Fed. Cir. 2001) (internal quotation and citation omitted). Any such disavowal "must be clear and unmistakable." *Anchor Wall Sys.*, 340 F.3d at 1307.

*Claim 1*

The parties dispute several terms found in Claim 1 of the '976 Patent, which reads:

> A miter saw comprising:
> a base;
> an arm assembly having a fixed end pivotally attached to the base,
> a free distal end forming a handle spaced outwardly therefrom and
> a central region therebetween provided with a rotary spindle
> supporting a cutting disc;
> said handle comprising a D-shaped portion, said D-shaped portion
> including a grip portion, said D-shaped portion being connected to
> said central region via a rotatable joint to permit rotation of said
> handle, said handle and said rotatable joint having a common pivot
> axis therethrough;
> said rotatable joint comprising a locking mechanism cooperating
> with the central region for permitting selective handle rotation
> about said pivot axis and for maintaining a selected orientation of
> said handle portion relative to said central region during a cutting
> operation of the miter saw.

('976 Patent, Col. 4, ll. 50-67; Col. 5, ll. 1-2.)

The first term in dispute is "a free distal end forming a handle spaced outwardly therefrom." One World asks me to construe the term as meaning "a handle formed at the other end of the arm assembly." Rexon does not dispute this choice of words, but argues that it is an incomplete definition, which ignores language about the spacing of the handle. Rexon's proposed construction defines the distal end in relation to the fixed end of the machine, *i.e.*, as its opposite. This limitation is supported by language in the specification that is cited by both parties. ('976 Patent, Col. 4, ll. 3-4) ("a handle 66 at the opposite end of the arm assembly 62"). For this reason, I construe the disputed term as "a handle at the end of the arm assembly opposite the fixed end, and spaced away from the distal end."

The second term in dispute is "said handle comprising a D-shaped portion." The shape of the handle claimed by the inventor is at the heart of the parties' dispute. One World would construe this claim as "the handle includes a portion *generally* in the shape of a 'D,'" while Rexon would construe the claim as "a portion of the handle is formed in the shape of a capital letter 'D' which, by definition, *is uniplanar*." The parties agree that "D-shaped handle" has an ordinary meaning to persons skilled in the relevant art.[1] In fact, "D-type" handles or "D-handles" are a conventional structure for miter saw handles, well known to persons of ordinary skill in the art. In its review of prior art, the '976 Patent discusses three "common" handle shapes, including "a horizontal D-handle." (*Id*. at Col. 1, ll. 31-34.) The specification also discusses how the rotatable handle feature found in a preferred embodiment can be used in a "D-handle type miter saw handle." (*Id*. at Col. 4, ll. 31-35.)

One World does not cite to any part of the specification in support of its effort to broaden the ordinary meaning of D-shaped handles to handles "generally" in the shape of the letter "d." The inventor's use of the term "D-shaped" within the claim is consistent with references to the D-shaped handles common in the art that appear throughout the specification. The prosecution history also references conventional D-type handles commonly known in the art, and distinguishes these handles–on grounds other than shape–from the handle of the proposed invention. Nothing in the history suggests that the handles of the prior art or of the invention

---

[1] Though the parties did not discuss this standard in their briefs or at oral argument, those of ordinary skill in the art would appear to be individuals with experience designing and using handtools, including miter saws.

5

need be only *generally* in the shape of the letter "D".² In sum, the intrinsic evidence does not support One World's effort to expand the ordinary meaning of "D-shaped."

Rexon's proposed limitation of the term is more challenging: it asks me to find that the shape disclosed by the invention is uni-planar. Rexon argues that its proposed construction does not improperly narrow scope of the claim, but only elucidates the inherent meaning of the term "D-shaped." Pointing primarily to the drawings and descriptions found in the '976 specification and prior art, Rexon argues that these indicate only uniplanar handles. Rexon argues that "something shaped like a 'D' must be generally uni-planar so that it resembles and can be recognized as having the shape of the letter." Although both the drawings and the descriptions in the '976 Patent specification depict the D-shape of the handle from the perspective of a single plane, I find no evidence that this aspect of the specification was intended as a strict limitation on the claim, or that it is otherwise inherent in the definition of "D-shaped."³ Therefore, I decline to adopt the limitations proposed by either party. Both the specification and the prosecution history support the ordinary meaning of the claim terms: that a portion of the handle is formed in the shape of the letter "D."

Another significant dispute between the parties is the meaning of the term "rotatable joint." The rotatable joint permits the user of the miter saw to change the orientation of the

---

²For example, the prosecution history notes that prior art discloses "a conventional D-type handle commonly known in the art."

³During oral argument, counsel for Rexon drew an analogy to a rectangular block of wood. Viewed from a single plane, the block would be recognized as rectangular by any elementary school student. Nevertheless, if held at a particular angle, the rectangle might appear more like a square: an optical illusion of a sort. While it is an interesting analogy, there is no evidence in the specification or prosecution history that one of ordinary skill in the art would find such a limitation inherent within the meaning of D-shaped.

handle when the blade of the saw is operated on a tilt (to cut beveled edges, for example.) Rexon argues that the rotatable joint disclosed in the claim must be a separate component of the miter saw, while One World argues that the joint may be either a separate component or simply a space or place where the D-shaped handle and central portion join. The claim language reads, "said D-shaped portion [of the handle] being connected to said central region via a rotatable joint to permit rotation of said handle." ('976 Patent, Col. 2, ll. 59-62.)

The salient issue is whether the other claim terms, the specification or the prosecution history limit the rotatable joint of the claim only to joints that are a separate component of the miter saw. The claim language and the specification consistently use the phrase "rotatable joint." The term "rotatable" clearly modifies the term "joint," and thus it is the "joint" that must be capable of rotation. *See Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1553 (Fed. Cir. 1997),(the court must employ "normal rules of syntax"), *overruled on other grounds by Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc); *In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983) ("[a] claim must be read in accordance with the precepts of English grammar"). Rexon finds this syntax to be persuasive evidence that the inventor claimed a joint that is a separate component and not merely the space where the handle and the central region of the miter saw arm assembly meet.

The fact that the joint must be capable of rotation does not mean that it must be a separate component. A joint comprised of a space or place where two components meet could also be capable of rotation. Consider the traditional ball and socket joint. The ball and socket form a joint notwithstanding the absence of a separate "joint" component, yet the joint is capable of–and in fact is designed to permit–rotation. The references to the rotatable joint throughout the patent

7

description are not, on their face, references to a separate structural element (as Rexon suggests) any more than they constitute references to a place where the handle and central portion join.

Both parties point to Webster's dictionary to support their proposed constructions of the term. Webster's defines a joint as "a part or space included between two articulations." *Merriam-Webster's Collegiate Dictionary* 630 (10th ed. 2000). Rexon emphasizes the part of the definition that reads "a part . . . between the two articulations." However, the definition clearly contemplates that a joint may be either a separate part (component) or simply a space.[4]

One World's proposed construction is consistent with the ordinary meaning of the term joint, as modified by the word rotatable. It is also consistent with the term as it is used in the specification and prosecution history, neither of which limit the joint to a separate component rather than simply a place where the handle and central region join. Construing the joint as a place where the D-shaped handle and central region of the arm assembly are joined is also consistent with other specification language teaching that the rotatable joint enables the handle to be rotated generally about the handle axis. Nothing in the specification indicates that this could only be accomplished if the joint is comprised of a separate component.[5] For these reasons I

---

[4]One World notes that space is synonymous with place. *See Merriam-Webster's Collegiate Dictionary* 885 (10th ed. 2000). Furthermore, the same definition cited by Rexon also defines joint as "a place where two things or parts are joined." *Id*.

[5]Rexon also argues that the word "via" implies that the joint is comprised of a separate component rather than simply a place where two parts of the saw join. Yet the two components may be joined by, or by means of, a place that is capable of rotation just as they may be joined by, or by means of, a separate component.

8

construe "rotatable joint" as a place where the D-shaped portion of the handle and central region are joined and are capable of rotation.[6]

The parties also dispute the meaning of "said handle and said rotatable joint having a common pivot axis therethrough." Both sides generally agree that the handle and the joint rotate around a shared axis. Rexon argues that because the claim expressly refers to the entire handle, and not merely a portion of the handle as described in other parts of the claim, the axis must pass "entirely through the handle." However, I do no disservice to the claim and its clear effort to distinguish between the handle as a whole and parts thereof by failing to construe the claim as Rexon proposes. Because the claim language refers simply to the handle and not any specific part of it, the axis must pass through the handle: not any particular part of it. Adding the word "entirely" imposes a limitation on the claim that is simply not contemplated by the claim language or the specification. The claim terms are construed as "an axis of rotation that passes through the handle and the rotatable joint."

The final component of Claim 1 disputed by the parties is the claim language:

> said rotatable joint comprising a locking mechanism cooperating with the central region for permitting selective rotation about said pivot axis and for maintaining a selected orientation of said handle portion relative to said central region during a cutting operation of the miter saw.

---

[6]This conclusion is consistent with the claim construction analysis outlined in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). Rather than starting with the dictionary definition and "whittling it down" based on the specification, *id*. at 1321, the claim terms must be construed in light of their ordinary meaning, with the dictionary serving as one tool "that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention," *id*. at 1308.

('976 Patent, Col. 4, ll. 64-67; Col. 5, ll. 1-2.)[7]  The core of this dispute is the meaning of "permitting selective rotation" and "maintaining a selected orientation."  One World proposes the simple constructions of "allowing the handle to be rotated to a position around the pivot axis" and "keeping the handle in a position relative to the central region," respectively.  Rexon would construe the claim as requiring "a lock that, when unlocked, permits the user to selectively vary the rotational position of a portion of the handle, and, when locked, maintains or fixes, the handle portion at a selected position."

The plain language of the claim calls not only for rotation of the handle but the ability of the handle to be maintained at a selected position once rotated.  The sole disclosure of the locking mechanism in the specification states that "to facilitate rotation of [the] handle 66, a detente button 76 is provided which when depressed by the user to enable the handle to be rotated.  When the detente button 76 is released, a conventional spring mechanism locks the handle in position." ('976 Patent, Col. 4, ll. 24-28.)  During patent prosecution, the inventor stressed that this limitation allows the orientation of the handle to be fixed at any position selected by the user.  The inventor also relied on the limitation to distinguish prior art.

I agree with Rexon that the claim requires a locking mechanism that permits the user to rotate the handle and fix it at a particular ("selected") position.  One Word's proposed construction of the phrase "for maintaining a selected orientation" appears to loosen this

---

[7]Rexon argues that the claim's reference to "said handle portion" is indefinite because it is not clear if that term refers to the entire handle, the D-shaped portion of the handle or the grip portion of the handle.  One World asks me to construe "said handle portion" as referring to the handle in its entirety.  That construction is consistent with the rest of the language of the claim, and particularly, the language of the preceding phrase, which claims selective "handle" rotation. I do not find the term "said handle portion" to be indefinite, though I may reconsider this issue at a later stage.

requirement. Nonetheless, the specificity of Rexon's proposed construction arguably restricts the patent to only the preferred embodiment found in the specification. Therefore, I adopt a construction incorporating language from both parties' proposed definitions: "a lock that allows the handle to be rotated to a position around the pivot axis and maintains, or fixes, the handle portion at a selected position relative to the central region during cutting operation of the miter saw."

Rexon also insists that the lock be defined as part of the structure of the rotatable joint. This limitation is supported by the plain language of the claim. (See '976 Patent, Col. 4, ll. 64) ("said rotatable joint comprising a locking mechanism"). However, the fact that the lock is part of the rotatable joint does require that the rotatable joint constitute a separate component. A rotatable joint that is a place where two elements of the saw meet is as capable of comprising a locking mechanism as a rotatable joint that is a separate structure.

**Claims 2 and 3**

The second and third claims of the '976 Patent relate to the miter saw user's rotation of the handle during operation of the saw. Claim 2 reads: "[t]he miter saw of claim 1 wherein the handle is rotatably adjustable between at least 0° and 30° from horizontal measured when the arm is lowered and the rotary spindle is horizontal."[8] ('976 Patent, Col. 5, ll. 3-6.) These claims address only the rotation of the handle within a certain range: they do not claim the ability to maintain, or fix, the handle at a particular position within that same range. Rexon argues that because claims 2 and 3 are dependent on claim 1 they must also incorporate claim 1's limitation of maintaining, or fixing, the position of the handle within that range.

---

[8] Claim 3 calls for adjustment of the handle between 0° and 40° but is otherwise the same. ('976 Patent, Col. 5, ll. 7-10.)

Although the limitation Rexon proposes–that claims 2 and 3 be construed to require that the handle is also "fixed" within the delineated range–would be consistent with claim 1, it is not required by claim 1. Claims 2 and 3 address the narrower issue of rotating the handle within a particular range. Construing those claims to include the further limitation of "fixing" the handle at any point within that range is beyond the scope of the claim language and is not expressly required by either the specification or the prosecution history. The specification states that the handle orientation can be varied and then fixed in a position; however, there is no indication in the specification that the handle must be capable of being fixed within any defined range of rotation. Nor do references in the prosecution history to the ability of the handle to be fixed when rotated compel a construction of claims 2 and 3 in which the handle must be fixed within the defined ranges of 0° to 30° or 0° to 40°. The prosecution history merely reveals that the orientation of the handle can be fixed at a position selected by the user. Therefore, the claims are construed as "the handle can be rotated at least 0° to 30° [0° to 40°], measured from horizontal.[9]

**Claim 5**

Finally, Claim 5 is directed to "the miter saw of claim 4 wherein the handle is rotatable to the same extent that the arm is adjustable about the horizontal axis so as *to enable the handle to be maintained in a horizontal orientation* during a compound miter cut." ('976 Patent, Col. 5, ll. 15-18) (emphasis on disputed terms). Rexon would construe the disputed words as: "the handle is rotated in a one-to-one relation to the adjustment angle of the arm assembly so that the handle is fixed horizontally, without any deviation from the horizontal, during operation of the miter

---

[9]I also reject Rexon's suggestion that the degree of rotation should be measured during operation of the saw, a construction that flatly contradicts the language of the claim (which reads, "measured when the arm is lowered and the rotary spindle is horizontal") and lacks support in the intrinsic evidence.

saw." Rexon's proposed construction appears more an attack on validity or a defense to infringement than an effort to construe the terms in light of the otherwise ordinary meaning of the terms. Moreover, One World's proposed construction ("to keep the handle in a horizontal position") fails to add any clarity to the ordinary and accustomed meaning of the claim language, confirming my impression that the language is clear on its face and does not require any further construction. Whether a handle that deviates slightly from the horizontal falls within the scope of the claim–an argument alluded to by both parties–is a matter for the finder of fact to determine at a later stage of the litigation.

For these reasons, the disputed claims are construed as stated herein.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: May 2, 2006